If you'll just state your name for the record, so I don't have to do it, that's good. Okay, you may proceed. My name is Daryl Dunham. I represent the plaintiffs' felonies. You'll have to speak up, Mr. Dunham. I will. Thank you. Is that much better? Yes, much better. Of course you want me to hear you. My client started working for Big Lots in 1992. Worked for Big Lots until about 1999. There was about a three or four month hiatus where she switched stores. And then she had, I think, a pretty unremarkable record working for them in that she was considered a very valuable employee. There wasn't any problems with write-ups or negative performance reviews, etc. It is true that she, back in the early 90s, she gave Big Lots a light boot slip. And Big Lots honored that slip. She did primarily bookkeeping, sedentary work. Occasionally she would help out at the cash register. But she did not do any heavy lifting because of her back. Then, in about 2004, she began to observe some things at the store that disturbed her. And I should say we're up here on those for summary judgment. And I understand that Big Lots is going to dispute a lot of this if we go to trial. But we're here on summary judgment. And so we get the benefit of all inferences. And so I think you can't assume that these facts are true. And so she observed some Big Lots employees, including a manager, marking down merchandise as unsaleable and then taking it home. Also, there were some issues with time cards and people getting paid for work that was not actually performed. And she began to complain. She was a whistleblower. She complained briefly. And then she complained briefly. And then she complained to corporate. And then she also complained several times on a hotline, which sparked an investigation. And eventually, the primary culprit was switched to another store. In the meantime, then, a new manager comes in, a woman by the name of Duran, who, as it turns out, was at least more than an acquaintance with the lady that was transferred. Because we know this from the record, that she took her home a couple of times, spent a little bit of time in Duran, spent a little bit of time in Ferris's home, which was out of her way. And also, Duran admits that when she came in, she knew there was problems with the store. And the record even reflects Duran telling my client, look, if they're going to get rid of you, they're going to get rid of you. And so, after she blew the whistle, Big Lots, principally Duran, refused to honor my client's work restrictions to the point that she so aggravated her back that she went to a primary physician who referred her to Dr. Park, a neurosurgeon. Eventually, there was surgery. And the recuperation time was of such a magnitude that she ran afoul of the 12-week PEMLA, 12-week limitation, and so they fired her. And you don't dispute that she didn't return in a timely manner? No dispute about that, Your Honor, whatsoever. And so, because when I have a case pending, this is really the only time I ever talk to the judges about it, I'm here appealing my client's opinion because we think that she should have a trial. That's the main reason. But I also want to get rid of this issue because it's something that's troubled me for some time, and that is the suggestion that's been made by Big Lots that this court embrace federal definition of these retaliatory discharge cases, which there's no question that some of the federal cases say that this fellow, Rivalta, who was the one that signed the termination letter saying, look, when you are gone by your 12 weeks, you're fired. And since Rivalta didn't know anything about my client's whistleblowing activities, at least I can't prove that he did. And so for purposes of summary judgment, and I think even in a trial, I'm never going to be able to prove that. And the trial judge said, well, since Rivalta didn't know, then Big Lots wins. Well, incite some federal cases for that. Well, point number one is that now I do everything I possibly can to try and prevent these cases from being removed in federal court. Because it's been my experience that even though it's the worst of your citizenship, federal judges don't do a very good job following Illinois law in these cases. And I certainly don't think that this court should be following federal law in these cases because, number one, they're not of precedential value. Number two, I just don't think they're good policy. And number three, I think there are cases in Illinois in the corporate knowledge doctrine that says, particularly when you're dealing with a corporation, what one agent knows should be imputed to the other agents. Well, that's Camden, right? Yes. So how do you dispute that? That's applicable here. Well, I didn't want to make their argument for them. Well, they're saying, well, that's not a retaliatory discharge case. Well, what's unique about retaliatory discharge cases when it comes to corporate knowledge doctrine? I submit there isn't really anything that should be unique about it. There's nothing about that body of law that would suggest that this court should carve out some kind of special distinction. He could, ah, this is a retaliatory discharge case, and so therefore corporate knowledge wouldn't have followed. But there's lots of good reasons why corporate knowledge should be part of the law in these types of cases, because number one, one corporate can send out a signal and say, look, we don't like these kinds of employees, particularly people that blow the whistle. And a corporate culture can be created, which I think is exactly what happened. Do you have any proof of that here? Do I have any proof of what you just said? Yes, I think I can prove that a culture was certainly created at the store in Jackson County. That I don't think there's any doubt about. Okay, you were talking about a corporate culture. Yes, yes. Here's the thing. The trial judge didn't say they win because the guy who fired her didn't know about this. What the trial judge is really saying is you haven't offered any evidence of proof of a causal connection between her whistleblowing activities and the reason she was fired. So what evidence did you present upon the summary judgment hearing to show that there was a causal connection between her whistleblowing activities in 2004 or whatever and her termination several years later? Okay. Well, first, the way I read the trial court's judgment, and perhaps you read something there, that that seemed to be the primary basis. They both didn't know they win. But as, Your Honor, you yourself know, and I've been here before you on other kinds of cases, similar issues, just because they've got an absenteeism policy doesn't mean they win. Oh, I understand that. And that's what they've got. It's an absenteeism policy, and that seemed to be the position that the trial court was aiming for. Is there any statement from any witness or anybody who says we wanted to get rid of her? You see what I'm saying? Is there anything? Yeah. There's no smoking gun that basically says, look, we're going to break this lady's back, literally, to either force her to quit or so that she'll have to go get surgery and we can get rid of her. And there's no claim her back problems had anything to do with work? There's no workers' compensation claim or anything like that? There was a workers' compensation claim. Okay, but that's not alleged. It's not alleged in your lawsuit that she was fired in retaliation. That is true, Your Honor. And I don't know that this is in the record, but I asked my client, I said, look, why do you think you got fired? Was it because you filed a complaint or was it because of the whistleblowing? She said it was because of the whistleblowing. It didn't have anything to do with the complaint. It was the whistleblowing because from the moment she blew the whistle, things changed. And that's what I think this War Paper case is about. I mean, they make the argument, oh, well, gee, this was 2004 when she blew the whistle and she didn't get fired in 2007. But from the point in time that she blew that whistle, she was the restrictions changed. We got the affidavit of Senator Green in the record. She was targeted. There was disparate treatment. They were after her. Now, is there anybody saying in a direct admission we're doing this because you blew the whistle? No. We don't have that evidence and we're never going to get that kind of evidence You're right. We're never going to get that kind of evidence. How are you going to prove that she was wrongfully terminated? May I ask a question? Your evidence could also be proven by custom. Custom. The causal connection can be proven by custom. So my question is this. Is there any evidence that this company didn't fire or terminate other people who didn't come back to work within the 12 weeks? What we have is this, Your Honor. I asked Mr. Revolta, who was also tenured under Rule 206, as their witness that could explain the absenteeism policy and how it worked. And he said he didn't know whether the thing was evenly applied or unevenly applied. He didn't know. And then I asked him, and under Sykirka and other cases, one of the questions I'm supposed to ask is what's the business justification for it? And it took about five or six pages in the deposition, but I think you'll be underwhelmed with his response. I don't think that he can offer, he didn't really offer any business justification for that policy at all. And then did summary judgment come before you could ask for another corporate designee or any further discovery? Well, you know, Your Honor, I'm glad you're helping me out about that. I'm just asking. If you send me back, I might, you said this is being taped here, so my memory is a bit bad. No, the answer is there wasn't any further depositions, and, frankly, I wouldn't have thought to ask for a further deposition until you suggested maybe that's something that I should consider. I didn't suggest, I just asked the question. I thank you anyway, Your Honor. You're welcome. Now, I do want to spend some time, and I'm not a lawyer, and so I keep trying for maybe somebody to help me out. Like I say, I can ask questions, I guess. You may not answer. I'm not sure how to pronounce this case. S-I-E-K-I-E, K-I-E-R-K-A. Cyperk is what I said. I'm very likely butchering that name. Now, to my knowledge, this particular court hasn't commented on that case. And I really think it's important that this particular court weigh in on that case because I think it has a lot to say about this case. In the facts of that case, what happened was that another district said that the employer does not win on summary judgment where the insurer's agent delayed recovery such that the employee claim blew by the 12-week FMLA claim. And so it was the actions of the insurer, not actual employee, but the agent insurer, and the other district said, we're going to need to go back and try this case because it presents a material issue of fact. Now. What district was that from, Cyperk? Third. I thought I was supposed to cite the district, but we did it in the third district in 2007. That was in a retaliatory discharge based on the worker's compensation. Yes, and that's sort of a distinctive thing. Now, why should that make any difference? Why should the actions of, should we have a separate standard for the retaliatory discharge kind of compiling a comp claim as opposed to being a whistleblower? I think that's a distinction without any real meaning. But more importantly, it's the actions of their management employee that put the burden on my client. And for the purposes of summary and judgment, if she had honored the restrictions, we wouldn't be here. She would probably still be working. And worse yet, Dr. Clark gives two light-duty slips to my client. My client gives those light-duty slips to Duran, and she refuses to honor them. And then when she needs the surgery and it takes more than 12 weeks to recover, they say, ah, FMLA, you're fired. Well, she doesn't dispute that she failed to return within the time period, and she doesn't dispute that she knew it was the policy, right? No question about that. In fact, I can breach attorney-client privilege. When she came in and she told me what was going on, I told her Illinois law doesn't recognize constructing discharge. It's up to you if you want to destroy your back because you're so angry about this and why you're treating it and go back there. But you have no claim until they terminate it. So she not only knew it because I told her that. So there's no dispute about that. But if you look at Sykirche, Your Honor, just because she gets fired because we have a neutral policy, allegedly neutral on its face, doesn't mean that they win. And I didn't put this in the brief, but I would like you to think about this for a moment, Your Honor. Let's assume that they had a policy that said something like this. If we find out while you're employed here that an MRI or other film shows that you've got a herniated disc, you're fired. Now, that's a neutral policy on its face. It might very well catch some employees that lift weights on the weekend. But the simple fact of the matter is the overwhelming number of employees that it's going to catch are going to be people that were injured at work. So the rule can't be just because they've got a neutral policy, they win and that my client knew about it. That just simply can't be the law. Now, what we have here is a situation where Big Lots knew that my client had a bad day. Big Lots intentionally refused to honor the op work slip, not only one from 1992 or 1994, but two separate op work slips issued by Dr. Park, refused to honor those. And my client basically destroys her back, has surgery, and she runs battle with 12 weights. Now, I think that the Sikirka case is not only good law, but this is actually a stronger case for holding Big Lots accountable for their actions than Sikirka, because they really are the direct cognitive agent for my client's surgery. They are the direct cognitive agent as to why she wasn't able to recuperate in 12 weeks. I think the jury would be free to conclude in this case that she wouldn't have had the surgery in the first place if they had honored the restrictions. And it was done by an agent that was not only aware of my client's whistleblowing and said that the store was a mess, that told my client, well, if they're going to get rid of you, if they're going to fire you, they can fire you, and was friends with the lady that got sent to the other store. Now, I think a jury should be free to conclude from these facts that there was that moaning there. There was that cyanide there. There was that intent to retaliate because my client blew the whistle. I believe, I have heard, that's why we took this appeal, that this is something that a jury should decide and not the judge. So you're saying that she should be given the privilege of saying, it's wrong, but I can be fired for the right reason, the wrong reason, or no reason. No, I hope I haven't been making that argument. If I've been making that argument, I've been ill-serving my client, Your Honor. Isn't she subject to that, being fired for the right reason, the wrong reason? Of course. Let me give you a classic example of where it would be, quote, the right reason. Let's assume that prior to her blowing the whistle, Big Lots came in and basically said this, Juanita, her actual name is Nita, Nita, we don't have enough work for somebody that can't do any lifting. So you've got a choice. You have to start doing heavy lifting, right? Or you're going to have to resign your job. Perfectly legitimate. As an employee, you're allowed to do something like that. But they didn't even say that. We don't even have in this record anybody from Big Lots saying, look, we've had a corporate change of policy here at this store, or corporate, why you have to be able to do heavy lifting in order to work here. They didn't even do that. Is the record to the contrary that, in fact, there was no policy? In other words, you said we have no heavy lifting. It's kind of like light duty work, right? Is there anything in the record that says we have no light duty and so we've got to make you do this? Or is there evidence to the contrary saying we're not going to honor the duty restrictions or something like that? Yes, I do cite in my time down. I can, I think, cite you to the record. But we do have evidence, and that's calendar self, 1992 up until 2004. Okay. Thank you, Mr. Dunham. Mr. Kirby, is that how you pronounce it? Yes. Okay. Good morning. May it please the Court. Travis Kirby on behalf of the Philippe Big Lots Stores Bank. Given that this is a case challenging employment termination, the analysis of the matter should begin with recognizing that Illinois follows the well-established which provides that employees and employers alike may terminate their relationship at any time for any given lawful reason. That rule for many, many years stood with no exceptions whatsoever and now stands only with the very narrow exception for certain retaliatory discharge cases where a plaintiff can show that either her workers' compensation claim or her whistleblowing regarding some sort of unlawful conduct caused her employer to make the decision to terminate her employment. As Mr. Dunham acknowledged, this is a whistleblowing case, not a workers' comp case. And it's important to note that case law in Illinois has been very clear restricting that narrow exception to cases challenging actual decisions to terminate. As Mr. Dunham also acknowledged, constructive discharge is not a cognizable theory at this Court, nor is demotion, nor is promotion. Nothing other than the actual decision to terminate may be challenged by this kind of claim. The trial board, therefore, focused properly on the actual decision to terminate this case, which occurred in May 2007, after more than 26 weeks of leave that Ms. Cowan took, commencing in October 2006, ending with her termination in May 2007. As it's been acknowledged this morning, it's completely undisputed that Ms. Cowan was aware of the policy, was warned in March 2007 that should she not return to work with medical authorization at the conclusion of her 26 weeks that she would be terminated, and that, in fact, she did not return at the conclusion of that period of leave. Therefore, Mr. Revolta, an HR professional who does not, by the way, work in the Carbondale store where Ms. Cowan was employed, reviewed the records, determined that she had exceeded her leave of absence period, and decided that her termination must take place, and therefore she was terminated. Is it relevant at all that the employer that terminated her didn't know anything about this issue, or should that be imputed? It's not only relevant, it's critical. It's critical to the issue of causation, which the Illinois Supreme Court has identified as an essential element to this cause of action. Without linking, without putting the knowledge of the prior whistleblower activity in the mind of the person who made the decision to terminate, it's not possible to identify a causal link between the employment action that's challenged and the event that's protected under the law. Well, it is if there's a custom of not firing people. There's a custom that can be imputed under Illinois common law, right? Or wrong? Your Honor, to the extent that there is some sort of custom-related way in order to show causation, there's no evidence in the record to demonstrate that in this case. And in any event, Mr. Revolta has testified, and it's undisputed, that the motivation, the guidance behind his decision here was a written policy that's part of the record that's neutral on its face. If there is a custom, it is that written policy that applies without respect to whether a person has engaged in a whistleblowing prior to his or her discharge. So my question is the same to you as it was to Mr. Dunham. Was there a discovery in the record about application of the neutral policy? There was. And what did it show? Mr. Revolta, the HR rep who made the decision I've issued here, testified that he had applied the policy to three or four individuals, and there's no evidence to suggest that it applied differently to persons who had blown the whistle on unlawful activity than it applied to persons who had engaged in noticeable. Right. So everybody who misses the time schedule is terminated. That's how the policy applied at the time. At the time of this termination. That is correct. Okay. And the other thing you said that was interesting to me is Mr. Revolta was not in the Carbondale store? Correct. You said he reviewed the records, her personnel file? Correct. So the information that she had good reviews and then all of a sudden in 2004 started the bad reviews, all of that still would have been available to him? Presumably in that Mr. Revolta has access to personnel records for the employees whom he supports as an HR rep for various stores. But the issue before him. I apologize. I thought that's what you had said. He reviewed the records. The records related to her leave. Okay. Not her personnel file. I'm sorry. You said to her leave. To her leave of absence. I'm sorry. But not her personnel file was not available to him? The record doesn't reflect whether he reviewed her entire personnel file. What was relevant to him was the period of time that she was off from work. Okay. Thank you. So with the narrow scope of this tort in mind and the fact that only the actual decision to terminate can be challenged, it's, I think, almost axiomatic that the concept of causation can't be stretched to cover the circumstances of this case. At the risk of stating the obvious, an unknown factor cannot serve as a motivating factor. And while it's true that corporations act through their agents and that the agents of a corporation acting on their authority do so on behalf of one party of the company, they don't all think with the same brain. Well, I think what Mr. Dunn is saying is he's building his case this way. Certain corporate representatives put her in a position where she could not comply with the absenteeism policy. Then another corporate representative who knew nothing about the whistleblowing just did his job and fired her because she did not comply with the absenteeism policy. But if she was put in that position where she could not comply with the absenteeism policy through the wrong motivation and so forth, he's saying, isn't that the same thing? You know, that's how she got fired. Essentially, that is a constructive discharge theory. Well, no, it's that she actually got discharged. She got discharged. But, Your Honor, a constructive discharge is a concept that relates to an employer creating circumstances designed to force the separation of an employee. That's what he has described here, that Ms. Duran allegedly created circumstances that eventually resulted in Ms. Cowan's termination. That is a constructive discharge concept. The law is clear. We can't focus on the events leading up to termination as the event being challenged by this tort. Instead, the only employment event that can be challenged is the decision to terminate. What case do you rely on for that? Heartline v. Illinois Power Company recognizes that courts in this state have declined to recognize that. The person wasn't terminated in Heartline. In Heartline, he was told to look for another job, but he hadn't been terminated yet. That's correct. That's what a constructive discharge they were talking about in Heartline. He was saying, they're going to discharge me because they're telling me to look for another job, but he hadn't been terminated. That's what that was about. But, you know, the argument here, I think, is if certain corporate representatives put into motion a series of events that is going to cause the termination, and they do that because of whistleblowing, and then as a result of those events that they put into motion, she's terminated due to some policy by some other corporate representative, she's been terminated due to whistleblowing. I think that's the argument. So what about that? I understand his argument, and I agree that you've stated it properly. The answer to it is that while this case isn't factually exactly on point with Heartline, the differences, factual differences, are without distinction, I think, because both cases, both Ms. Cowan's theory and the plaintiff's theory in Heartline, were focused on the idea that an employer is taking steps short of actually terminating that are meant to bring about the separation of the employee's employment. That's admissible in any of these cases to prove motive. And I'm not arguing as to admissibility. I'm arguing as to the point that the event that may be challenged is not the act of setting in motion things that will result in termination. It's only the decision to terminate that may be challenged. If they set those things in motion for the purpose of getting her terminated. Well, the law is narrowly construed in this area. It's a strictly construed tort, and there's no evidence putting Ms. Durand in a position of participating in the decision to terminate. And, in fact, there's no evidence in the record that would ascribe to her this motive that Ms. Cowan believes she acted with. In fact, it's quite an elaborate theory that she complains in 04, and sometime in 06, a manager who was not even at the store when she complained comes in and requires her to do all the aspects of her job. She's not able to do them, and then has to have surgery, and then is off work for 26 weeks. And all that was this grand conspiracy to get her fired under a neutral policy that applies to people without respect, whether they can blow the whistle. No, I think that's the question. Is there any evidence of Mr. Dunham's theory? There is not. So it's not true that she had good performance evaluations prior to the whistleblowing, and then after the whistleblowing, the performance evaluations started to be downhill. That would be untrue? We don't dispute that she had good performance evaluations beforehand, and then under a new manager, her performance evaluations were not as good. And is it also untrue that her light-duty restrictions were no longer honored after 2004? Is that also not true? That's disputed. So that's a disputed fact. But it's a disputed fact that doesn't go to an issue on which the court relied, and properly relied. The issue of causation turns on whether the person who made the decision challenged by the court had knowledge of the underlying whistleblower. We cannot form a link between the two events, as is necessary in this case. But our review is de novo, right? Yes, Your Honor. And I'm still hoping for a case that you can show me that says it's so limited to the knowledge of the corporate employee. Is Heartline the only one you can suggest? No, Your Honor. In fact, we signed in on our brief a number of cases where the employer was entitled to judgment because there wasn't a knowledge link between the productive activity and the termination, including Weissman v. Gnestra, Carter v. G.C. Electronics, which we explicated in detail in our briefing. But a lot of those cases are federal cases? No, they're state cases, Your Honor. I understand, but I guess I'm having trouble with the concept that if an employee has to have personal knowledge, then why is custom and practice relevant in a retaliatory discharge case under Illinois common law? I'm not talking the federal law now. I'm just talking Illinois common law. Understood. And, by the way, we're not asking the court. We think the court need not rely on federal precedent to reach the conclusion we're pursuing. It's basic causation and the notion that something, some act requires a stimulus that's relevant to the claim here in order for there to be causation. And here the stimulus, the whistleblowing, can't be linked in that way to the action because the actor that would possess knowledge of it doesn't exist in the context of the decision to terminate. With respect to Mr. Dunham's point about Securica, we think that that case is readily distinguishable because not only was the work comp case, and that's relevant because the leave of absence in that case bears a direct link to the protected workplace injury. Whereas the leave of absence of a person who's simply blown a whistle doesn't bear that direct connection. Additionally, the parties at issue in Securica appear to have known about the work comp claim, the underlying protected activity, so it's distinguishable in that respect as well. And I thought it was notable that Mr. Dunham's example about a neutral policy that if you have a herniated disc, you'll be fired, he pointed out that that's notable because he pointed out that that would disproportionately impact people who have work comp claims. That's not true of people in this common circumstance. Such a policy would not disproportionately impact whistleblowers. This is a neutral policy, so setting aside the issue of knowledge of the decision maker, which we believe is dispositive on its own, even if you do not agree with that point, the fact that a neutral policy that would apply to anyone without respect to their risk of lower status was relied upon, that's undisputed in this case, as a reason for the termination, precludes causation from existing. That is underscored by the fact that so much time passed between the whistleblowing and the termination here, at least two years. They say revenge is a dish best served cold, so maybe it's better to wait two or three years. Fair enough, but my point in drawing attention to the passage of time is that there's just no reasonable inference that can be drawn from that passage of time without something that would place in the mind of the relevant parties the alleged protected activity here. And just to point back to Carter v. GC Electronics for a moment, that's the most important case that I mentioned a moment ago. That case involved a plaintiff who could not prove that the decision maker at issue who terminated the plaintiff's employment was aware of the protected activity at the time the decision was made and thus, judgment was appropriate for the defendant in that case. We contend that that decision controls here for the reasons I've described about knowledge. And it's also important to note that Ms. Callen would not be without remedy. There are other laws that are not so narrowly drawn available to her. If she wanted to challenge the disregard for her medical restrictions, she could have filed a claim with the Illinois Commission on Human Rights for disability discrimination or an ADA claim. Those claims are available to people who want to challenge the disregard for life duty or the disregard for medical restrictions. She chose not to do that. She cannot now bootstrap a very narrow tort aimed solely at a decision to terminate in order to resurrect those long-dead claims. With respect to the neutral policy, one last point I would make is that this Court and Silver v. Brown and the Supreme Court in the Hartline decision have long recognized that absenteeism is a legitimate reason for terminating an employee and that retaliatory discharge liability won't attach to an employer's decision to terminate on the basis of absenteeism. Here, my client gave 26 weeks. It treated everybody the same as the record with respect to the 26-week period. It's undisputed that Ms. Callan couldn't return, and in fact, it's undisputed that she's never been able to return to this job since going on leave. Thus, we would submit that summary judgment should be affirmed. Thank you, Mr. Carter. Mr. Dunham? I don't have much time. I have points I'd like to make. Number one, I don't think what Volta, what he knew and didn't know, has absolutely nothing to do with the case. What he asked, what it appeared initially they took the position, had a policy of just applying policy. Looked at the personnel file and applied the policy. His sign-in term has nothing to do with the case. And we cite cases in our brief about the difference between ministerial functions and discretionary functions. At least they reported initially that Volta was just doing a ministerial function. Point number one, I do want to encourage the court to take a very close look at that psychiatric case because if you find that that reasoning is valid, then I think I'm 90% of the way home in terms of what should be done in this particular case. The question was asked about the application of policy. And starting at C257 of the record, I asked the question, Mr. Revolta, did Big Lots have a light-duty program? He said, our goal is to return associates to work as quickly as possible. If we can accommodate, we will accommodate. And then next page, C258. Now, what if you have an associate who has got permanent light-duty restrictions no more likely than, say, 25 pounds? Answer, we evaluate it in on a case-by-case basis by doing an interactive process with the associate to see whether or not we can accommodate that or not. There was no interactive process with regard to this case. Then I asked questions about, well, what about somebody that has gone by the 26-week policy? And I said, has there ever been a case, and who is the director? Well, he's the one, this Mark Fisher guy, that can make the decision to waive the 26-week policy. That's found on page C261 of the record. So there is somebody who is in charge of waivers of policy? Yes. I think that's the only way to read Mr. Revolta's testimony. If you look at C316 of the record, it's where Judge Solerson summarizes what she did. It seems to me, I looked at it again, all she's doing is she's saying, look, there's an absenteeism policy, it's a valid reason, Revolta didn't know, Big Lots wins. That's the way I read it. Now, as to the constructive discharge, every constructive discharge case that I'm aware of in Illinois, I'll venture, I'll go out on a limb because I haven't read it all, but I'll make a wager. Every one of them, there was no termination by the employee law. It was the employee who was driven out of work. And that's the distinction here. My client was terminated by the employee law. Now, there is a direct connection. He says, Cypherka, there was a direct connection. The insurance agent delayed the treatment, and so the FMIA was violated. There's a direct connection here. According to her treating position, they wouldn't honor her restriction. She needed to have the surgery, and so therefore she ran afoul of the absenteeism policy. Direct connection, just like there was in Cypherka. Now, you also have to connect that, don't you, that they didn't honor the restrictions because of the whistleblower. Well, in some way. I'm sorry, Your Honor, because in Cypherka, there was no evidence introduced in that case where the agent decided that the reason that I'm going to delay the treatment was because she filed a complaint. It was treatment under the complaint. It was treatment pursuant to the complaint. That's right. But I think that's something that would be a dangerous precedent for the court to start saying that's under the Cypherka theory to place that burden on the plaintiff. Now, finally is my client did get bad evaluations. And in the records C215 and 16, C297, 298, she complained about those evaluations, and she in her written response said, I'm being evaluated this way because I'm being retaliated against. That's what she said. She wrote that in her own hands? Yes. So for them to say, gee, we didn't know. How can we say this has nothing to do with whistleblowing? Let the jury decide. Thank you, Mr. Dunham. We'll take the matter under advisement. Thank you, Your Honor. Thank you, counsel. The court will now be in recess.